## WILL WHITTON v. THE STATE.

### No. 6790. Decided April 26, 1922.

### Rehearing Granted June 21, 1922.

**1.—Murder—Evidence—Acts of Third Parties—Principals.**

Where defendant in his own testimony said that when he first saw the deceased he was going in an opposite direction, and that he turned so that they would meet, there was no error in admitting testimony that the son of defendant whistled and pointed down the road where deceased was; besides, the question of principal was in the case, which made this admissible.

**2.—Same—Evidence—Cross-Examination—Motive—Animus of Witness—Principal.**

Upon trial of murder there was no error in the cross-examination of defendant's son by the State, to ask the witness whether he did not hesitate and say, "The dam son-of-a-bitch has been giving us trouble," etc., to show the attitude of the witness and to support the theory of principals. Following Pierson v. State, 18 Texas Crim. App., 561.

**3.—Same—Continuance—Bill of Exceptions.**

On trial of murder there was no error to show that an alleged absent witness was met by the defendant before he reached the court-house, and besides the same matter was proved by defendant's own testimony.

**4.—Same—Sufficiency of the Evidence.**

Where upon trial of murder, the evidence sustained the conviction there was no reversible error.

**5.—Same—Charge of Court—Manslaughter—Words and Phrases.**

Where complaint is made that certain expressions in the charge relative to manslaughter, such as: "And that such state of mind did actually exist at the time of the commission of the offense," and the court should have used the word "homicide," there is no reversible error.

6.—Same—Manslaughter—Charge of Court—Abandonment of Difficulty.

Where, the evidence did not raise the question of the abandonment of the difficulty by the deceased, and that the defendant knew he had done so, the court should not have charged upon the abandonment of the difficulty; furthermore, the charge assumed that there was formed in the defendant's mind the design to kill at the time of the former difficulty without requiring the jury to so find, the judgment must be reversed and the cause remanded.

Appeal from the District Court of Van Zandt. Tried below before the Honorable Joel R. Bond.

Appeal from a conviction of murder; penalty, imprisonment for life in the penitentiary.

The opinion states the case.

*Stanford & West, Earl M. Greer, R. M. Lively,* and *Wynne & Wynne,* for appellant.—On question of admitting the testimony as to defendant's son whistling: Bird v. State, 231 S. W. Rep., 399; Finks v. State, 209 id., 154; Edwards v. State, 172 id., 227.

On question of cross-examination of defendant's son: Parker v. State, 196 id., 537.

*R. G. Storey,* Assistant Attorney General, and *A. A. Dawson,* County Attorney, for the State.—On question of acts of third parties: Sarli v. State, 189 S. W. Rep., 149; Arensman v. State, 187 id., 471.

On question of motive of witness: O'Neal v. State, 57 Texas Crim. Rep., 249; Latham v. State, 172 S. W. Rep., 797.

MORROW, Presiding Judge.—The appeal is from a judgment condemning the appellant to confinement in the penitentiary for life for the offense of murder.

The appellant, using a shotgun, shot and killed Riley Hunsaker. The tragedy occurred near the store in the village of Whitton. There were a number of eyewitnesses who testified.

According to the State's theory, supported by testimony, the parties met on the public road. Appellant presented his gun and ordered the deceased to stop. The deceased obeyed and raised his hands in an attitude showing that he was unarmed, and before the shot was fired, asked the appellant not to shoot him.

According to appellant's theory, as developed from his testimony and some others, he had had an altercation with the deceased a few hours before the homicide and had gone to the store to secure transportation to the county seat in order that he might file a complaint against him. He was not aware that he would meet the deceased, but had been informed and believed that he had gone some five miles into the country. In the altercation, the deceased, who was a much larger, stronger and younger man, had struck appellant, had threatened him

and told him to get his gun, that he was prepared for him, and he· (appellant) armed himself for defensive purposes. He had, according to the testimony, also been informed that the deceased had on previous occasions threatened to assault and injure him. On the morning preceding the homicide, he had gone from his home to the store, and had there met the deceased. They walked together and engaged in a friendly conversation to a point near the home of a neighbor, where they separated. The deceased had a conversation with his wife and then overtook the appellant. A quarrel ensued about some pasturage, and deceased claimed that appellant impeached the veracity of the wife of the deceased. The quarrel culminated in the deceased assaulting and threatening him. On reaching a point near the store, he observed the deceased traveling in a direction which would not cause them to meet. While he proceeded upon his way, he heard deceased exclaim: "Watch out, or Keep your eyes open," and turning, he saw the deceased traveling in the direction which would result in their meeting. When they were near to each other and near a large tree, appellant commanded the deceased to stop. This he repeated, and the deceased halted, saying: "Damn you, don't shoot me." Appellant told him to leave, that he would not hurt him. After a few. seconds, during which appellant had his gun presented in a shooting attitude, the deceased jerked his right hand a little and moved his body as though he was fixing to spring upon the appellant. Thinking that the deceased was going to spring upon him, and having in mind the previous threats, appellant shot him. At the time he was smarting from the blow which he had received some hours before, which he said caused an abrasion of the skin, and blood to flow from his mouth, and he was also angry, excited and nervous. Appellant was forty-eight years of age and in declining health. Deceased was younger and weighed about 220 pounds.

Touching the incidents occurring on the day of the homicide and antecedent thereto, as developed from the evidence of the State, appellant had caused his son to put some stock in the pasture where some ungathered corn and some cane of the deceased would be accessible to them. Because of this, the wife of the deceased had remonstrated with the appellant, and he had responded in language which was offensive. She, on the morning of the homicide, informed the deceased and he approached the appellant upon the subject. Deceased struck appellant with his fist, after which they separated. Appellant went to the home of his son, Laurence Whitton, and had a conversation with him. He then went to his own home and secured a. shotgun, returning to the home of one Jacobs, where he had last seen the deceased, and sought him there. A conversation took place between the appellant and Jacobs and his wife in the presence of the wife of the deceased. Appellant was remonstrated with and told that he was too old to engage in trouble of the kind which he had appar-

ently contemplated. He replied that he was just the right age and started in the direction of the village of Whitton. He was overtaken by a wagon in which were riding his son Laurence, the witness Williford and two other men. The wife of the deceased, before the appellant got into the wagon, protested and told him that the deceased was unarmed; that their difficulties could be settled. without bloodshed, and when he declined to desist from his apparent purpose of seeking her husband, she followed him and followed the wagon, and was nearby at the time of the homicide. This testimony of the State touching the declarations of the appellant was controverted by him. When, however, the wagon reached a point about 100 or 125 yards from the store, appellant got out of it and met the deceased and killed him.

Williford, a witness for the defendant, was driving the wagon in which the appellant and his son Laurence and others were riding a few moments before the homicide. In his testimony, Williford said that they reached a gin and appellant said he would get out there. At that time the wife of the deceased was about twenty or thirty steps behind the wagon. Appellant went down the road towards the store. The witness saw the shooting but heard no conversation between the parties. · On cross-examination, he said that after appellant got out of the wagon, Laurence Whitton whistled and pointed down the road west (in the direction of the deceased); that appellant at the time looked back at Laurence and Laurence pointed west down the road. Deceased was then coming up the road, traveling east. Laurence got out of the wagon and started down to where his father was before the shot was fired and was pretty close to the road when the witness saw the gun raised; that they were all looking that way; that they had seen Mrs. Hunsaker following behind the wagon, and saw the appellant going that way with a shotgun.

In a bill of exceptions complaint is made of the testimony of Williford to the effect that Laurence Whitton whistled and pointed down the road. The objection urged is that it was hearsay. The bill is defective, but if adequate to present the matter, the contention is not sound. From the testimony of Williford, the jury was authorized to conclude that the appellant heard the whistle and saw the gestures of his son Laurence. Appellant, in his own testimony, said that when he first saw the deceased he was going in an opposite direction; that he turned so that they would meet. If he heard and acted upon what his son said and did, proof of his son's words and conduct was not obnoxious to the rule against hearsay testimony. It was also contended by the State that Laurence Whitton was a principal offender and that in making the sound and gestures, he was acting with the appellant, knowing his unlawful intent, giving him encouragement by his words and conduct.

Another bill complains that in the cross-examination of Laurence Whitton, the State's counsel said to him: "Didn't you hesitate then

and say, 'The d—n s—n of a b—h has been giving us trouble all the year and the Ramseys have been backing him up in it?''

This was objected to upon the ground that it was hearsay. In passing, we will say that the bill does not show that it was not made in the presence of the appellant. Aside from that fact, Laurence Whitton was a witness for the appellant and his attitude towards the deceased was available to the State and bore upon his animus. Moreover, the question, if answered in the affirmative, would have tended to advance the State's theory, which was not without support in the evidence that Laurence Whitton was a principal offender within the meaning of the statute. Penal Code, Article 76. The point, we think, is without merit. Pierson v. State, 18 Texas Crim. App., 561.

A continuance was sought because of the absence of a witness named Wilhite. This witness was in a distant county but arrived before the conclusion of the trial and his testimony was heard. It was favorable to the appellant. He related the fact that the deceased had made threats against the appellant and that this had been communicated to him by the witness. The appellant and some of his friends undertook to meet the witness. The appellant went to Terrell and intercepted the witness before he reached the point of his destination—Wills Point. Parties interested in the prosecution, it seems, were also endeavoring to intercept the witness. Sullivan was at Wills Point when the train came upon which the witness would have arrived had he not been intercepted by the appellant. In a bill of exceptions, complaint is made of the fact that Sullivan's presence there was proved by another witness. We think that it was a relevant fact, and moreover, it was proved, in substance, by appellant's own testimony.

We are unable to bring ourselves in accord with the views advanced by the appellant that the evidence does not warrant the verdict rendered. The State's theory of the happenings at the immediate time of the homicide was proved by a number of witnesses. In fact, between the witnesses for the appellant and the State, save the testimony of the appellant alone, there is but slight diversity. Some of the antecedent facts are controverted and the mitigating facts are in dispute.

We are aware of no law nor precedent which would warrant this court in disturbing the verdict upon the ground that the evidence did not support it. There is no complaint of the charge of the court; no illegal evidence was admitted over appellant's objection, and no proffered testimony was excluded.

Therefore duty demands an affirmance of the judgment, and it is accordingly ordered.

*Affirmed.*

ON REHEARING.

June 21, 1922.

HAWKINS, JUDGE.—At the time the original opinion was prepared

no objection to the charge appeared in the record, and alleged errors complained of therein were not considered. It is now made to appear that timely exceptions to the charge were presented, but were inadvertently omitted from the transcript. They are now before us and we are asked to consider same upon rehearing.

Complaint is made at certain expressions in the charge relative to manslaughter such as, "and that such state of mind did actually exist at the time of the commission of the *offense*," the criticism being that it led the jury to believe that in the mind of the trial judge an *offense* had been committed; that the charge should have said "at the time of the homicide." Perhaps the language suggested in the exceptions would have been better than those used by the court, but taking the charge as a whole we think it does not present a serious question. There is no probability that the jury attached to the language complained of the construction urged by appellant.

We find the fourteenth paragraph of the charge to be as follows:

"You are further instructed that if you believe from the evidence that the defendant had had a previous difficulty with the deceased on the morning of the homicide and that in such difficulty the deceased made an attack upon the defendant, causing pain or bloodshed, and you further believe from the evidence that such assault, together with all the facts and circumstances in evidence prior to and at the time of the killing, created in the defendant such a state of mind as to render him incapable of cool reflection, and that such state of mind did actually exist at the time of the commission of the offense, then you are charged that same would be deemed in law adequate cause, reducing a voluntary homicide to the grade of manslaughter.

But if you believe from the evidence that the defendant had had a previous difficulty with deceased on the morning of the homicide, and that the deceased had abandoned such difficulty, and you further believe from the evidence, beyond a reasonable doubt, that the defendant shot and killed the deceased, as charged in the indictment, in pursuance of a formed design which had remained in the mind of the defendant from the time of such prior difficulty and which actuated the defendant in shooting and thereby killing the deceased, and that he was not acting in his own self defense, as self defense is hereinafter explained, then the offense would be murder."

Serious criticism is lodged at the latter clause of the foregoing charge, and has given us much concern. We do not think the question of *"abandonment"* of the difficulty was in the case. If it was, however, then the charge tells the jury if *"they"* believe deceased had abandoned it, etc." This was error under all the authorities. (See Branch's Ann. P. C., page 1107, Section 1966). The evidence at the trial might well show that deceased had abandoned a difficulty, but the rights of the accused cannot be so measured. Deceased must not

only have abandoned the difficulty, but accused must *know* he *had* done so, and so knowing renewed the attack. The charge seems to us to be further vulnerable to the assault made upon it, as assuming that there was formed in appellant's mind a design to kill at the time of the former difficulty, without requiring the jury to so find. Even if the jury should so find, then it occurs to us the question would be not one of "abandonment" of the difficulty by deceased, but that of "cooling time" of appellant. If during the former difficulty deceased assaulted appellant, causing him pain or bloodshed, which rendered his mind incapable of cool reflection, and he then formed a design to kill deceased, and conceding that at the time of the killing deceased said or did nothing which might go to constitute "adequate cause" when considered either alone or in connection with the former assault, then the whole question of the grade of the offense (self defense aside) would appear to turn upon whether between the assault and the actual killing sufficient time had elapsed for the passion to subside in the mind of a person of ordinary temper.

We regret that the record was defective causing a failure to consider the matter upon the original submission, but believing the charge complained of subject to the criticism, and this having been called to the court's attention in a timely manner, it becomes our duty to now grant the motion for rehearing, set aside the order of affirmance, and reverse the judgment of the trial court, and remand the case for retrial.

*Reversed and remanded.*